May it please the court and counsel, this case presents two questions. What are the obligations of the federal courts on Rule 29? And I'll address that first in a case of circumstantial evidence. According to the United States v. Brody, the court's obligation is to ensure that inferences arising from circumstantial evidence are reasonable and that the conviction logically follows from the law and the facts. The key question in this case, given that standard, is is it logical and thus a permissible inference from our common experiences to presume embezzlement solely from a discrepancy in accounting standards? And I use the words common experience. That comes from the Shaw case. The Shaw case, as you'll recall from the brief, is the Navy fellow that sued to get his discharge overturned. There was a presumption in the Navy Digest that if you lost money, if you were the dispersant officer, you were guilty. Now, in this case, the jury was instructed properly, and we don't make any assertion that you can't prove embezzlement from circumstantial evidence. Is your whole position that the government never started off with a baseline? As far as the proof of loss, Judge Paez, yes. There was no baseline. In a fiscal year, just like this court operates on, we know from the evidence that they know exactly from the Stamp Distribution Office exactly how many stamps went to the Harrison Post Office. So your argument is that because they never produced any document confirming, because they have records of the number of stamps that went, but your argument is that because they never produced a document confirming whether those stamps were actually signed for. That's a lack of proof. Judge Rawlston, that's partly it. What they do is they actually do get a signature for those stamps. They send out a Form 17, which is your requisition form, to use common language, and the person has to verify that they got them. But more importantly, the postmaster, and we put some of those in your excerpt, when she puts the deposit in each day to the bank in Harrison or wherever her bank was, that's a real deposit slip for real money. So the first element of the lack of proof is before you even get to what you can infer about whether someone embezzled, you've got to have a loss. And we're saying there's no proof of loss. Well, there's a discrepancy between the number of stamps that the government says were sent and the amount of money that was brought into the post office vis-a-vis those stamps. Judge Rawlston, yes, that's right. There's a discrepancy on their accounting form. Their daily form, because in the daily form, the amount of stuff you're supposed to have, either stamps or money, is supposed to be somewhere in either the two drawers for the two ladies that worked there or in the vault in the back. But there's another part about the inferences that is what judges do on Rule 29. And from the proof is, is it logical to say if there's a discrepancy in the count that embezzlement is proven? One problem is that she acknowledged that there was a discrepancy from her own records, based on her own records. In fact, she did. She said, there's a discrepancy here and I don't know where it comes from. But why isn't that enough to infer he's responsible for the loss? Good question, Judge, because of the statute. Because the statute doesn't hold you liable and presume you guilty just because there's a discrepancy in what you're supposed to have. It requires conversion. And conversion, there's got to be some sort of transitory act proved by either circumstantial or direct evidence that you took it. Well, wasn't there testimony from the relief postmaster that she brought the discrepancy to the postmaster's attention and was kind of shined on regarding that? She was suspicious about it and brought it to the postmaster's attention. Isn't that some indication that there was some, at least, she was trying to hide the fact that there was a discrepancy or cover it up? I don't think, no. Yes, she did bring it to her attention, but no. Because, you know, you can be accountable. Just like when I was a company commander, I had to sign for an armored cavalry company. But if a wrench isn't there, that doesn't mean I stole it. That means I'm financially responsible for it. And that's the flaw in the government's case. But if you're not trying to find out what happened to it, that at least supports an inference that for whatever reason you don't want to discover where it is. I don't think that it does because, for one thing, the evidence is that Vicki always balanced out on her daily forms. And, more importantly, there wasn't any external audit by the post office. These small post offices, according to the record, had gone through three different accounting systems in that 2003. They've gone from sport to moves. And these accounting systems you carry over. And the evidence on cross-examination is there was no audit when they went to the new accounting systems. And there's also evidence that Vicki did well on the old system, the hand system, and not so good with the computer system. So I don't think you can draw the inference just from one offhand conversation. What are we supposed to make of the, I think there were ten, undated daily 17 forms where she withdrew stamps from the vault? The form 17s, if you look on both the form itself and on the back, you'll see there's handwritten notices and you'll see cross-offs and add-ons. And under the record, the post office people were calling those floating form 17s. And in the record, you'll see a discussion where the post office man at page 184 in the record that's in your appendix acknowledges that that's what they are and that's what people do. And from a practical human standpoint, when someone needs stamps, you go out back to get them, you scribble something down, and you're supposed to do the paperwork later. What you've got in the small post office is you've got Vicki going back there. She's the only one, just like Ingrid, the other lady's the only one, getting something for a customer, scribbling it down. It's supposed to be on the form later, but it doesn't. And that brings up another point of a discrepancy. Before we leave that point, though, the postal inspector said in his 32 years of experience, he had never had anyone hand him 10 unaccounted for form 17s, dating back as much as three years. And I think that shows some sloppiness. But once again, there's also, back in those years, back to the indictment starts September 24, 2003, the post office itself never had come in and audited to verify that they had the amount of money they were supposed to have when they started the new system. May I please reserve two minutes for rebuttal? Yes. Good morning. Jessica Fair on behalf of the United States from the District of Montana. Did you try this case, counsel? Yes, I did, ma'am. May I ask you a question, please? Why didn't the government simply put into evidence the baseline amount of stamps that were supposed to be in the post office as of the date of 2003? And, Your Honor, it's the position of the government that we did, if I may clarify. Okay. The position of the government has always been, and as was briefed to the district court, that when you look at the form 1412 that you have in your excerpts of record, and if we'd like to flip to one, we can certainly do that. It might help in the explanation. I believe it's appellant's excerpt of record. Is it volume one? Volume two, Your Honor. And it would be A in the thicker packet of. What you have in front of you in volume two of appellant's excerpts of records, excerpt of record A, you'd note it's marked government's exhibit one at the bottom, is the form 1412 that was found when Mr. Waymire entered the post office in Harrison, Montana, on that August 2nd. But that's the form she signed and prepared, right? Correct, Your Honor. According to the evidence, I thought there was supposed to be a form that was maintained by the post office, that when stock is shipped to the various post office branches, that there's a receipt that's signed for the amount of the merchandise and mailed back or sent back, transmitted back. So where is that document? That's noted, Your Honor, if you look at the form that we have in front of us. The opening balance, it's the top right-hand corner of the page. It's noted AIC 840. And Mr. Waymire testified at trial that that amount, the $10,545.85, that's the tracked dollar figure for the stamps. Mr. Waymire also testified that the post office doesn't keep track of individual stamps. They keep track of the dollar amount, the value of the stamps. When the stamp shipment is received by the Harrison post office, whoever is in charge that day, usually Ms. Dyckman, goes into the computer system, this form at the end of the day, and marks on the other side of the page, the left side of the page, where she has the same side of the page right below it, 841, the stock she received. There she would note. What line is that? That is the second line, Your Honor, directly below opening balance. There you'll note 841. If she had received $250 in various postage that day, she would note that there. Did she count it, or do they count it before they send it? Both, Your Honor. Now, you talked about dollar amount. Yes, Your Honor. Okay. Now, we're dealing with various denominations. Correct. Are you suggesting that you don't keep an inventory of the quantum of particular denominations that you sent? Not at all, Your Honor. That's that form 3295, and I know this case involved a lot of forms. The form 3295 is the form that the postmaster is then required to sit down with those stamps and say, I got 28.37-cent stamps, 50 coils of 100 stamps, and keep that. When you hear in the testimony, Ingrid Lawrence and — Don't keep that in the central office. No, Your Honor. The testimony at trial — How do you ever go back and balance it out? By the dollar amounts, Your Honor. And that was the key to the case, and I think if — Let me just see if I can understand this. So the postal stamp distribution office, is that what it's called? Yes, sir. The local post office needs some stamps. Yes, sir. And they place an order? Yes, sir. And then they said we need, I don't know, whatever denominations of stamps. And the postal distribution office sends those stamps in coils, I gather, whatever, to the local office. Is that right? Correct. And when they send them, they don't keep track of what they're sending? There's an individual inventory sheet that is shipped to the post office, and Ingrid Lawrence and Ms. Dyckman testified that they received those on the — But what's kept at the central repository to say, you know, we shipped this, we shipped that, they got this, they got this, they didn't? How do you keep the central records to know what was sent out, what was received, what was lost? How do you keep central records? As was explained by Mr. Wehmeyer, the stamp distribution office sends the stamps certified mail, registered certified mail. They're signed for by the postal employee that takes them. Then at the end of the day, when back to the form, Government's Exhibit 1, they know that they got $250 worth of total stamps. They know the post office, for accounting purposes, creates a record only by the value of the stamps. That's how they track it. You enter $250 in under line 841. You file this form electronically with the accounting services center. The accounting services center got the same memo from the stamp distribution office that says, I sent $250 worth of stamps to the Harrison Post Office. They were signed for, and now look, the Harrison Post Office has noted on their form that they electronically filed, that they received that, and that it's in their stock. And that's how we get the opening balance, that big number at the top. That's how they daily keep track of how much stock, what's the total dollar amount of everything that's been sent to a rural post office in Montana. What if the merchandise is not received? What happens? And Mr. Wehmeyer addressed that, I believe, on cross-examination. Your Honor, what he said was, if it's not signed for, if there's not a registered mail receipt that's returned, and they don't pick it up in this 841 category within a reasonable amount of time, then there's contact made back to the post office. To the local office? Yes, Your Honor, to say what happened. Do they keep those return receipt documents for a certain period of time? I don't know, Your Honor. Now, on this particular form, it starts out with $10,545. Yes, Your Honor. Now, somebody testified that they knew that that amount was too high, because this was a small local office and they only expected a certain amount of sale. Correct, and that was Mr. Wehmeyer. That was the excess stock report that he talked about in his initial testimony. So when did this large amount first begin to appear? Well, we do know from, I believe it was Defendant's Exhibit 509, that Ms. Dykman initially received a letter in, I believe, June of 2003, saying, you're over your excess stock report. And the measurement of that is approximately three times what an average post office of your size would carry. So the post office has a calculation they use. So they figured this out. They sent her a letter at that time. And, Your Honor, as was testified to at trial, we don't know what follow-up was done in 2003 when she was initially on the excess stock report. But nobody went after her and said, you know, we've got a serious, we've got concerns here with this number. She received a letter saying that there was. No, that wasn't, nobody from the Central Post Office? As far as I know, Your Honor, no. Must be a team of auditors within the Postal Service someplace, somewhere. Yes, Your Honor, and that's what Mr. Wehmeyer was. But he didn't come out, it was a while before he showed up. Correct, Your Honor. And I have no explanation for that. But what I can tell you is that when he did show up, because she had $10,000 in stock, and he did the count, and he looked at what was there, it wasn't there. There was no stamps. There was no money. She had signed every day that she had this much money in that post office, either money or stamps. Did he automatically rule out a mistake in accounting? In his testimony, Your Honor, he clarified that when he went out, he went out initially just to say, let's figure this out. Let's figure out what kind of excess stock you're carrying. Do you have obsolete stock? He talked about commemorative stamps. He goes out, not in an investigative fashion, but to help the postmaster, to clarify whatever this problem is. And when he gets there, and the first thing out of her mouth is, I counted everything last night. I only have $2,000 worth of stock in the main stock. That's supposed to be the big repository that has $10,000. And, oh, by the way, here's 10 forms. They're not dated. I don't know when and if they were added. And Mr. Waymire's testimony is that she said she doesn't know if they were added. Her testimony on the stand differed a bit. And instantly he realizes, if she only has $2,000 in stock, she's got to have $8,000 in the two tills, either hers or Ms. Lawrence's, in order to get to that number. And that's just unheard of. Well, there could have been a mistake. She could have double-counted the form 17. It wouldn't have affected the 840, Your Honor, because that's the number that has to link up to the accounting services center. That's the number when she enters, I got $250 in postage. It has to add up. So if this was merely a bookkeeping error, if this was merely somewhere she added some of these paper forms, and that's important, too. And I don't know if I made that clear in my brief, Your Honors. In all these forms, the 3295s, the 17s, these are paper forms. These are forms used internally by a little post office. The electronic form, the only thing that's submitted to the post office is what you see in Excerpt of Record A, that electronic version. Everything else is done on paper. This opening balance is the amount that is verified through the post office. And through the post office, we know she got this much money. If it was simply an accounting error on those paper sheets, she would have still been remitting the money, as is noted later on the form, where you remit cash. Whether she knew which stamps were selling or not, it would have lowered her bottom line, and it didn't. Did she take over an existing post office? Yes, sir, in 1991. And at that time, was there a physical inventory? Yes, Your Honor. There was testimony from Mr. Waymire, as well as from Mr. Knight, who was the postmaster in another rural area who testified on behalf of the defendant, that when you take over a post office, that there is a complete accounting of everything there. If there's any shortages, the outgoing postmaster is responsible for those, and everything from that point forward is a clean slate for the new postmaster.  During that audit, Your Honor? She took over. You suggest that there was a physical inventory, so that somebody purportedly sat down and counted the stamps. Your Honor, from the testimony from the two individuals I mentioned, as well as from Ms. Dyckman, during cross-examination, there was a clean slate when she started at the Harrison Post Office in 1991. My question is, did somebody sit down and count the stamps? They would, Your Honor, on that Form 3295, which individually lists all of the stock that's held by the post office and then how it's distributed out into the individual tills. That's your central office, but the physical inventory of the post office, the small post office, who sat down and counted the stamps? During when the post office was transferred, Your Honor? I don't know that person's name. What we based our testimony on, Your Honor, was the policy of the United States Postal Service, as well as the testimony from Ms. Dyckman saying that it had occurred, and the testimony from Mr. Wehmeyer, or excuse me, from Mr. Knight, saying that it occurred when he transferred post offices in the same rural Montana district. So when Mr. Wehmeyer showed up and he discovered this large discrepancy that he thought was unusual, did he call in a team of auditors, outside auditors? Was there an external audit? Mr. Wehmeyer himself is a compliance auditor, and that was in the transcript. It became appliance auditor, but his position is compliance auditor. So he initially sat down, as noted, and did an audit with Ms. Dyckman. Excuse me, that was the second audit. The first audit was done with Office of Inspector General Special Agent Mark Morse and Ms. Lawrence, where they actually did go through everything in the post office and counted everything by hand. And they did separate counts and then compared. And then the same thing was done three days later with Ms. Dyckman and Mr. Wehmeyer, where, again, every effort was made to count everything in the post office. In one instance, she handed Mr. Wehmeyer $45 in cash in an envelope with some story about it, how it was for a trust account for a customer. So every effort was made to count every single stamp that was in that post office before this case was referred for further. Did anybody check her bank accounts? Your Honor, her bank – Did you get a search warrant at her house or anything like that? No, Your Honor. Her home was not searched, nor were her bank account records obtained. And as the trial prosecutor, if I may explain, I guess, my reasoning for that, is the theory of the government all along was that this was a hand-to-cash operation, that she was selling the stamps, the stamps were never recorded as going into one of the tills, and if she sold a roll of stamps for $20, she was sticking the cash in her pocket or she was taking people out to lunch. And that this was something that happened from 2003 until she was caught in 2006. And so while in hindsight, I would have received, I would have gone back and gotten those records, Your Honor, simply to make it as tight as possible, at the time I did not believe that we would see large deposits of cash. Okay, thank you. Thank you. First point that I didn't make is that both employees, like in Booknight, had access to the vault. That was a problem in Booknight, is other people could have had access where the property was that disappeared, and Ingrid did too. On the question of a double counting, you can double count if you entered on both, you got a form for your personal drawer and a form for the whole office that goes in every day. And when asked on cross-examination what daily reports did they look at, the answer, and it's in your transcript at page 249 on your excerpt of record, they only looked at three days, August 1st, 2nd, and 3rd, 2006. How can the government say that it was linked up properly? If you look at those Form 17s, most of them are 37-cent stamps, and the testimony is, in 2006, they were using 39-cent stamps. So the way to reconcile it, to see if the Form 17s were entered, would at least be to audit the period when the 37-cent stamps were used, after the switchover and counting method. Counsel, were these arguments made to the jury? Yes. And the jury didn't buy the defense? I believe they were, but yes, Your Honor. I mean, I can't remember all my closing to tell you the truth. But the point is, though, getting back to the law as to what the court does on Rule 29. We have to look at the evidence in the light most favorable to the prosecution. Right, you certainly do.  And the second prong is, does the inference logically flow, considering it in the light most favorable to the government? And it doesn't. Because if you can infer merely from a loss, not civil liability, but criminal liability, then any time there's a shortage, you know, the government's theory in their brief, in the conclusion of their brief, is she failed to respond or track a request to aid, she failed to fill out Form 17s and removed postage, and failed to track the stock and finances of Harrison Post Office, as she knew it was supposed to do, and she trained others. That's a civil liability. That is something that can be handled in the disciplinary system. But that's not the inference that can be drawn toward conversion, the criminal tort, if you will, that's implicated by the statute. And that's why the judge should have granted the motion. Thank you, Your Honor. Thank you. We appreciate your arguments. The matter will be submitted. Our next case for argument is McGigan. I think I pronounced – I don't know if I pronounced that correctly. McGigan v. Hall. McGigan. I'm going to put my hand up. Listen to him.
judges: Paez, Rawlinson, Jenkins